IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 29, 2017 Session

## BRADLEY JETMORE v. METROPOLITAN GOVERNMENT OF NASHVILLE & DAVIDSON COUNTY, TENNESSEE

Appeal from the Chancery Court for Davidson County
No. 16-418-IV      Robert E. Lee Davies, Senior Judge

No. M2016-01792-COA-R3-CV

A petitioner seeking to inspect and obtain copies of traffic accident reports prepared by the Metropolitan Nashville Police Department ("MNPD") "promptly," as required by the Tennessee Public Records Act ("TPRA" or "the Act"), filed a petition for injunctive relief. The trial court granted the petitioner the relief requested, and the Metropolitan Government of Nashville and Davidson County ("Metro") appealed. We affirm the trial court's judgment.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed as Modified, and Remanded**

ANDY D. BENNETT, J., delivered the opinion of the Court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Jonathan Barrett Cooper, J. Brooks Fox, and Jennifer Bonilla Moreno, Nashville, Tennessee, for the appellant, the Metropolitan Government of Nashville and Davidson County.

Douglas Ray Pierce and Kyle David Watlington, Nashville, Tennessee, for the appellee, Bradley Jetmore.

## OPINION

### I. FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the right of an individual to obtain traffic accident reports "promptly" from Metro and implicates the TPRA, codified at Tenn. Code Ann. §§ 10-7-101–702. The primary section of the TPRA at issue in this case is Tenn. Code Ann. § 10-7-503(a)(2)(B), which provides:

The custodian of a public record or the custodian's designee shall promptly make available for inspection any public record not specifically exempt from disclosure. In the event it is not practicable for the record to be promptly available for inspection, the custodian shall, within seven (7) business days:

(i) Make the information available to the requestor;

(ii) Deny the request in writing or by completing a records request response form developed by the office of open records counsel. The response shall include the basis for the denial; or

(iii) Furnish the requestor a completed records request response form developed by the office of open records counsel stating the time reasonably necessary to produce the record or information.

Bradley Jetmore filed a petition in April 2016 in an effort to require Metro to provide him "prompt access to inspect traffic accident reports" that Metro creates and maintains.[1]  Mr. Jetmore asserted that he has regularly and routinely requested traffic accident reports for years and that, until the fall of 2015, Metro provided him with prompt access to these reports.  Beginning in December 2015, Mr. Jetmore alleged, Metro stopped providing prompt inspection of these records.  As a result, Mr. Jetmore began requesting copies of current accident reports.  In response to his requests for copies, Mr. Jetmore alleged, Metro has, "with regularity, intentionally and willfully ignored, denied, and/or delayed the production of these . . . records beyond the limit established by the Public Records Act."

Mr. Jetmore stated that beginning in March 2016, Metro resumed its practice of making accident reports available for inspection.  However, the reports Metro was making available were as much as three weeks old when, for many years, Metro regularly made reports available that were no more than two or three days old.  With regard to his request for copies of the reports, Mr. Jetmore alleged that Metro instituted an unlawful policy whereby only copies of three reports would be provided on the day of a request, with the remainder to be provided at some later date.  The relief Mr. Jetmore sought in his petition included an injunction requiring Metro to make its records available for inspection promptly, as it did for many years, and to produce copies of requested documents promptly.

Metro moved to dismiss Mr. Jetmore's petition pursuant to Tenn. R. Civ. P. 12.02(6), arguing that Mr. Jetmore failed to state a claim for which relief could be

---

[1]There were initially two plaintiffs when the petition was filed.  Mr. Jetmore's co-plaintiff voluntarily dismissed his claims in July 2016, and Mr. Jetmore continued as the sole petitioner.

provided. Metro contended that (1) the TPRA requires records to be made available for public inspection promptly, but not immediately; (2) the TPRA permits a custodian of records to adopt reasonable rules governing the making of copies of public records; and (3) a record custodian is not required to produce public records in the specific manner in which a member of the public may request. Metro explained that it stores its traffic accident reports in an electronic database called TITAN ("Tennessee Integrated Traffic Analysis Network") that is maintained by the Tennessee Highway Patrol. Metro did not explain how its use of TITAN impacts its ability to allow inspections or provide copies of records promptly. Mr. Jetmore opposed Metro's motion to dismiss and requested a show cause hearing in accordance with Tenn. Code Ann. § 10-7-505(b).

The trial court denied Metro's motion to dismiss and scheduled a hearing to be held in July 2016 at which Metro was to show cause why Mr. Jetmore's petition should not be granted. In support of its position that Metro was operating within the guidelines of the TPRA, Metro submitted a declaration by Jason Starling, a captain in the MNPD and Central Records Division Manager. Mr. Starling explained that the MNPD is required to redact certain information from the public records it maintains before it can release any records to the public. The information that must be redacted includes driver's license numbers, social security numbers, and juveniles' names and identities. MNPD central records staff manually redact this information from traffic accident reports by opening each document in a software program and selecting the protected information, which is then electronically redacted.

In his declaration, Mr. Starling explained how traffic accident reports are created and finalized. MNPD patrol officers who investigate traffic accidents draft accident reports in TITAN, and the officers usually draft these reports during the shift in which the accident occurs. Supervising officers generally work the same hours as the officers they supervise, and a supervisor typically reviews the accident reports drafted during a shift before the end of the shift. The supervisor either approves and submits the report into the TITAN database or rejects the report and sends it back to the officer for revisions. An accident report does not become final until the supervising officer submits the report into TITAN.

The Central Records Division's administrative office and administrative compliance training unit are responsible for printing copies of all accident reports, and the individuals who work there operate the print shop. According to Mr. Starling, print shop employees log into TITAN each business day and search for reports on accidents that occurred two to three days earlier, with the corresponding reports submitted into TITAN by 11:59 p.m. on the previous business day. "For example," Mr. Starling explained, "on Thursday, staff would generally search for reports on all accidents that occurred on Monday, with their corresponding reports being submitted no later than 11:59 p.m. on Wednesday." Once the print shop employees identify the finalized

accident reports in TITAN from the previous two or three days, they initiate the electronic redaction process.

Mr. Starling then explained how the accident reports are made available for public inspection:

> Each business day, the set of reports that have been reviewed, redacted and printed are picked up by a North Precinct officer and transported to the North Precinct. The reports are transported to the North Precinct in the afternoon or evening, by an officer working the B or C detail shift. Once at the North Precinct, the reports are available for public inspection during business hours. This process ensures that most accident reports are available for public inspection from the Records division within 72 hours after the report is submitted into TITAN by the supervising officer.

Mr. Starling described the process for obtaining copies of accident reports:

> Private citizens may request *copies* of traffic accident reports at the public service counter. . . . Requests for copies of three (3) or fewer traffic accident reports may be made in writing or in person at the public service counter. If a private citizen requests copies of three (3) or fewer traffic accident reports, the reports are reviewed, redacted and printed while the requestor waits, and thus provided immediately upon request, or "on-demand."

Mr. Starling then explained that if an individual wants more than three reports of any kind, the individual is required to fill out a particular form referred to as MNPD Form 720. Mr. Starling continued:

> In accordance with Tenn. Code Ann. § 10-7-503(a)(2)(B), if MNPD is unable to process a request for copies of records within seven (7) business days, a notification of denial or letter advising of the approximate date that the request will be fulfilled will be provided within seven business days. The current MNPD Form 720, revised in June 2015, informs customers that MNPD has seven (7) business days to process all requests.

> The MNPD policy allows for the processing of large-volume requests during evening and overnight shifts. This policy of processing the larger printing and copying requests during off-peak hours allows the Records Division to allocate its limited resources more efficiently and process all records requests in an accurate and timely manner.

The trial court held the show cause hearing on July 14, 2016. No live testimony was offered at the hearing. Instead, the court heard arguments from the lawyers representing Metro and Mr. Jetmore based on declarations that had been filed by the parties in support of their positions. The trial court entered a Memorandum and Order on August 19, 2016, granting Mr. Jetmore the relief he sought. The trial court's findings of fact that are relevant to this appeal regarding the public's inspection of accident reports include the following:

Paragraph 9 of the Verified Complaint alleges that for well over two decades, Metro provided access to inspect traffic accident reports daily during normal business hours; that Metro would produce each day a folder of traffic accident reports released for public inspection by the mid-morning hour; that these reports were almost exclusively for accidents which had occurred within the last two to three days (unless it was on a Monday when the reports from the end of the prior week would be released). In its Answer, Metro does not deny these specific factual allegations. Likewise, neither in his deposition nor in any of his declarations does Captain Starling deny this past course of conduct by Metro for many years. At some point and time within the last twenty years, these reports were made available for inspection at the North Precinct.

. . . .

Each business day the set of accident reports that have been reviewed and redacted are picked up by a North Precinct officer and transported to the North Precinct. The reports are transported to the North Precinct in the afternoon or evening. Once at the North Precinct, the reports are available for public inspection during normal business hours.

This procedure benefits both Metro (so it will not be overwhelmed by producing the same report for inspection again and again) and the public (anyone can come to the North Precinct to inspect all of the accident reports which have been printed).

This process ensures that the majority of accident reports are available for public inspection from the Records Division within seventy-two hours after the report is submitted into TITAN by the supervising officer. That means if an accident occurred during the day on a Tuesday, the final accident report would be submitted into TITAN by the end of the patrol and supervising officers' shift that day. Thereafter, the redaction process would commence and the redacted reports would normally be available for inspection at the North Precinct sometime Thursday afternoon

or Friday morning. (Approximately seventy-two hours after the end of the patrol and supervising officers' shift on Tuesday).

The court made the following relevant findings of fact regarding the public's request for copies of accident reports:

> In August 2014, the standard operating procedure ["SOP"] for the Central Records Division of the Metro Police Department changed. Pursuant to the August 2014 SOP, any request for a copy of an accident report and information had to be submitted on an MNPD Form 720. Form 720 states in part:
>
> > MNPD has seven business days to process all request (sic). If unable to process the requests, a notification of denial or letter advising the approximate date of when the requests will be completed will be sent out within the seven days. Tenn. Code Ann. § 10-7-503(a)(2)(B).
>
> Pursuant to the standard operating procedures of the Central Records Division for Metro Police Department (June 2015), any transaction which exceeds three reports, including an accident report, must be submitted on MNPD Form 720. Captain Starling testified that this new standard operating procedure took effect August 2014. Although the standard operating procedure requires the staff for the records division to use Form 720 whenever a member of the public requests more than three accident reports, there is nothing on Form 720 to inform the public they will not receive more than three reports on the day they submit Form 720. Captain Starling testified his staff simply informs persons who ask for more than three copies that they will not receive those copies on that day.

The trial court then made the following conclusions of law with respect to the public's right to inspect the accident reports:

> The first issue for the Court to determine in this case is whether Metro is making these traffic accident reports available for inspection promptly. . . . Whether a governmental entity is acting "promptly" under the statute will have to be determined on a case by case basis. In this case, the standard operating procedure for investigating officers of an accident is to complete the accident report by the end of their daily shift. Likewise, the supervising officer is required to review these accident reports for corrections by the end of their daily shift. This means that the vast majority of accident reports are in the hands of the records division of the Metro

Police Department within twenty-four hours of the accident. The Central Records staff then manually redacts prohibited information from the traffic report. The proof indicates this procedure is usually accomplished within twenty-four to forty-eight hours. In fact, the proof from Metro establishes these reports should be available for public inspection after seventy-two hours from the end of the shift of the investigating officer. This proof is consistent with Metro's procedure over the last two decades whereby Metro would provide these accident reports for inspection within approximately three days after the date of the accident.

Metro began using the electronic database "TITAN" in 2013. In their brief, Metro appears to suggest that the use of TITAN causes a delay in Metro's ability to make these records available for inspection. The facts do not support this argument. This is because Metro maintains custody of the electronic record from its inception. Metro creates the record and Metro makes the necessary corrections and redactions. It does not need to rely on TITAN to produce records which Metro already has in its custody and control.

However, Metro contends it is not practical for them to be bound by an Order from this Court establishing a definition of "prompt" that is specific to Metro. Instead, Metro argues, as long as it complies with the second requirement in the statute after the expiration of seven days it is still in compliance. The Court does not agree with this interpretation. There is no question Metro is able to produce the vast majority of these accident reports for inspection well before the expiration of seven days from the date of the accident. In this case, allowing Metro seven days to produce these records for inspection does not qualify as "prompt" under the Act. Thus, Metro has failed to comply with the promptness requirement for producing these accident reports for inspection.

The trial court then made conclusions of law with respect to the public's right to be provided with copies of accident reports as provided in the TPRA. The court rejected Metro's argument that the Act's requirement of "promptness" did not apply to copies of the reports. The court wrote:

. . . Although [Tenn. Code Ann. § 10-7-503(a)(2)(B)] does not specifically address copies, as a practical matter, once an accident report has been produced for inspection, a requestor should be able to obtain a copy of that record from the Central Records Division of Metro. Moreover, this interpretation complies with the directive of the Legislature to broadly construe the Public Records Act "so as to give the fullest possible public access to public records." T.C.A. § 10-7-505(d).

- 7 -

Turning to Metro's open records request Form 720, the Court finds that the form itself fails to comply with the Act. Just as Metro has done in the inspection and process of these records, it likewise overlooks the promptness requirement in its form for copies. In other words, copies should also be produced promptly and in the event it is not practical for the record to be promptly copied, then the custodian shall within seven business days make the information available or send a notification of denial, or a letter advising of the date the copies will be completed. Thus, Metro's form indicating it has seven days to process requests for copies is not in compliance with the Act.

Finally, Metro argues that its policy of producing copies of three or less accident reports immediately and producing copies at a later date if more than three are requested is an acceptable [policy] pursuant to T.C.A. § 10-7-503(a)(7). The Court finds that Metro's "three request policy" is not in compliance with T.C.A. § 10-7-503(a), which requires Metro to produce copies of public records which have been made available for inspection, promptly. The "three report rule" is arbitrary and is contradicted by the proof in this case of Metro's ability to produce copies of multiple accident reports within seventy-two hours of the end of the shift of the investigating officer. If in any particular instance, Metro determines that it cannot promptly produce all of a requestor's request for documents, it is entitled under the statute, to take whatever time is reasonably necessary to produce the requested records as soon as reasonably possible.

Following the trial court's recitation of its findings of fact and conclusions of law, the court awarded Mr. Jetmore injunctive relief, which was later modified in response to Metro's motion to alter or amend the judgment. The operative order that Metro appeals directs Metro to do the following:

1. In the event a request for an accident report is made, Metropolitan Government of Nashville and Davidson County shall provide for the inspection of such traffic accident reports that it creates and maintains, within seventy-two hours from the time the investigating officer completes and submits the report to TITAN.

2. In the event a request for an accident report is made, Metropolitan Government of Nashville and Davidson County shall produce copies of such traffic accident reports that it creates and maintains, within seventy-two hours from the time the investigating officer completes and submits the report to TITAN.

- 8 -

3.      All such requests for inspection or copies shall be furnished to the requestor during regular business hours.

4.      Metropolitan Government of Nashville and Davidson County shall amend its MNPD Form 720 to make it consistent with the language set forth in T.C.A. § 10-7-503(a)(2)(B).

5.      In the event Metropolitan Government of Nashville and Davidson County is unable to promptly produce requested accident reports, then pursuant to T.C.A. § 10-7-503(a)(2)(B), it shall send within seven business days a written notification advising the requestor of the approximate date when said reports will be available.

Following the entry of the trial court's decision, counsel for Mr. Jetmore filed a motion to alter or amend the judgment to include an award of attorneys' fees. Concluding that Metro's failure to produce accident reports promptly within seventy-two hours of its demonstrated ability to do so constituted a "willful denial of access to the requested records," the court awarded Mr. Jetmore attorneys' fees in the requested amount of $56,884.55.

Metro appeals the trial court's judgment. First, Metro argues the trial court lacked subject matter jurisdiction to consider Mr. Jetmore's petition because Mr. Jetmore did not specifically identify any particular records to which he was denied access. Second, Metro argues the trial court erred in finding Metro was "willful" in its violation of the Act. Finally, Metro contends the case has become moot because the issues Mr. Jetmore had regarding the overall production schedule were addressed by the time of the hearing on Mr. Jetmore's request for attorneys' fees.

## II. STANDARD OF REVIEW

The trial court's findings of fact were based on documentary evidence, consisting of the parties' declarations and Mr. Starling's deposition transcript. In the absence of live witness testimony, an appellate court is able to assess credibility and weigh the evidence as well as the trial court. *Kelly v. Kelly*, 445 S.W.3d 685, 693 (Tenn. 2014). As a result, the trial court's findings of fact are not entitled to a presumption of correctness. *Id.*; *cf.* TENN. R. APP. P. 13(d) (appellate courts normally accord trial court's findings of fact a presumption of correctness unless record preponderates otherwise). The trial court's interpretation of the TPRA involves a question of law, which we review de novo, with no presumption of correctness afforded to the trial court's conclusions. *Mansell v. Bridgestone Firestone N. Am. Tire, LLC*, 417 S.W.3d 393, 399 (Tenn. 2013); *In re Estate of Tanner*, 295 S.W.3d 610, 613 (Tenn. 2009).

III. ANALYSIS

A. Subject Matter Jurisdiction

The issue of subject matter jurisdiction involves a court's authority to adjudicate a particular dispute; therefore, it should be considered before other issues raised on appeal. *The Tennessean v. Metro. Gov't of Nashville & Davidson Cnty.*, 485 S.W.3d 857, 863 (Tenn. 2016); *Redwing v. Catholic Bishop for the Diocese of Memphis*, 363 S.W.3d 436, 445 (Tenn. 2012).

> A court's subject matter jurisdiction in a particular circumstance depends on the nature of the cause of action and the relief sought. It does not depend on the conduct or agreement of the parties, and thus the parties cannot confer subject matter jurisdiction on a trial or an appellate court by appearance, plea, consent, silence, or waiver.

*Dishmon v. Shelby State Cmty. Coll.*, 15 S.W.3d 477, 480 (Tenn. Ct. App. 1999) (citations omitted); *see also The Tennessean*, 485 S.W.3d at 863.

Metro argues that the trial court lacked subject matter jurisdiction in this case because Mr. Jetmore was unable to point to a particular record that he was wrongfully denied. In support of its argument, Metro relies on the language of Tenn. Code Ann. § 10-7-505(a), which entitles a Tennessee citizen to file a petition to gain access to any state, county, or municipal record described in Tenn. Code Ann. § 10-7-503 that has been denied[2] and "to obtain judicial review of the actions taken to deny the access." The statute specifies that a court "shall be empowered to exercise full injunctive remedies and relief to secure the purposes and intentions" of the statute and that "this section shall be broadly construed so as to give the fullest possible public access to public records." Tenn. Code Ann. § 10-7-505(d). Mr. Jetmore agrees that he is not suing to gain access to a particular record; he seeks injunctive relief "to require Metro to promptly produce records for inspection and not impose restrictions on inspection and obtaining copies that are not allowed under the [T]PRA." As he explains in his brief, Mr. Jetmore is more interested in obtaining prospective relief than in rectifying past denials of prompt access.

Initially, we note that Metro's alleged failure to produce the accident reports promptly is tantamount to a denial of the reports in violation of the TPRA. *See* Tenn. Code Ann. § 10-7-503(a)(3) ("Failure to respond to the request as described in subdivision (a)(2) shall constitute a denial and the person making the request shall have the right to bring an action as provided in § 10-7-505."). We find the case *Schneider v.*

---

[2]Both parties agree that the traffic accident reports at issue are public records that are covered by the TPRA. *See* Tenn. Code Ann. § 55-10-108(f) (motor vehicle accident reports "shall be open to public inspection as a public record under the public records laws").

*City of Jackson*, 226 S.W.3d 332 (Tenn. 2007), instructive. The petitioners in *Schneider* sought records described as "field interview cards generated by police officers of the City." *Schneider*, 226 S.W.3d at 335. The trial court rejected the City's argument that these documents were protected from disclosure and issued a permanent injunction requiring the City to provide a written response "to all future written public records requests from *The Jackson Sun* or its agents and to explain in its written response whether the record sought would be produced and, if not, the basis for nondisclosure." *Id.* at 338. The Court of Appeals reversed for reasons not relevant to this appeal, *id.* at 339, and the Supreme Court reinstated the trial court's injunctive relief, *id.* at 348. The Court wrote:

> This statute plainly and in unambiguous language confers upon courts broad powers to grant injunctive remedies that secure the purposes and intentions of the Public Records Act. The permanent injunction issued in this case directly remedies the City's failure to respond to Petitioners' multiple requests for public records. Requiring the City to provide a written response articulating its reasons for nondisclosure will secure the purposes of the Public Records Act by ensuring that the City denies such requests only after thoughtful and careful consideration.

*Id.* We find no discernible distinction between the petitioners' request in *Schneider* for "interview cards generated by police officers" and Mr. Jetmore's requests for recent traffic accident reports. The petitioners in *Schneider* were seeking injunctive relief requiring the defendants to produce a category of records, and, like Mr. Jetmore, they were not seeking the production of a particular document. *Id.* at 334-36.

As the Supreme Court has recently opined, "The Public Records Act has a noble and worthwhile purpose by providing a tool to hold government officials and agencies accountable to the citizens of Tennessee through oversight in government activities." *The Tennessean*, 485 S.W.3d at 864*; see also Taylor v. Town of Lynnville*, No. M2016-01393-COA-R3-CV, 2017 WL 2984194, at *2 (Tenn. Ct. App. July 13, 2017). The purpose of the TPRA is "to facilitate the public's access to government records." *The Tennessean*, 485 S.W.3d at 864. We believe this purpose would be frustrated if we limited a petitioner's opportunity to obtain relief under the Act by requiring him or her to specifically identify particular documents to which he or she has been denied, especially if the basis for the petition is the method by which records are (or are not) produced. When a petitioner is interested in a category of public records encompassed by the TPRA, he or she may not know the details of a particular document. We conclude that the trial court had subject matter jurisdiction to adjudicate the controversy in this case and to award Mr. Jetmore injunctive relief.

B. <u>Willfulness of Violation</u>

Metro does not directly challenge the trial court's findings of fact or conclusions of law with regard to Metro's obligation to allow Mr. Jetmore to inspect accident reports and obtain copies of the reports promptly. Rather, Metro contends the trial court erred in concluding that it acted "willfully" in failing to disclose the reports promptly and in awarding Mr. Jetmore his attorneys' fees.

The TPRA permits a court to award attorneys' fees and costs to a petitioner in the following circumstances:

> If the court finds that the governmental entity, or agent thereof, refusing to disclose a record, knew that such record was public and *willfully* refused to disclose it, such court may, in its discretion, assess all reasonable costs involved in obtaining the record, including reasonable attorneys' fees, against the nondisclosing governmental entity. In determining whether the action was willful, the court may consider any guidance provided to the records custodian by the office of open records counsel as created in title 8, chapter 4.

Tenn. Code Ann. § 10-7-505(g) (emphasis added). Both the Court of Appeals and the Supreme Court have addressed the "willful" component of Tenn. Code Ann. § 10-7-505(g) to determine whether attorneys' fees are warranted in a particular TPRA case. In *Taylor v. Town of Lynnville*, the petitioner, Mr. Taylor, made three separate requests to inspect records. *Taylor*, 2017 WL 2984194, at *2-4. The trial court ruled that the town improperly denied one of Mr. Taylor's requests but denied his request for attorneys' fees, finding that the denial was not "willful." *Id.* at *1. Mr. Taylor appealed, arguing that the trial court erred in failing to find the town wrongfully denied his other two requests for records and in refusing to award him costs and attorneys' fees. *Id.* at *5.

On appeal, the Court of Appeals noted that the failure to produce records as required by the TPRA constitutes a denial of the records. *Id.* at *3. The court explained that "[t]he default understanding of the statute is that a citizen may inspect public records promptly upon request. Any delayed access to nonexempt public records is contingent only on whether such prompt inspection is 'practicable.'" *Id.* at *4 (quoting Tenn. Code Ann. § 10-7-503(a)(2)(B)). The court then addressed the meaning of "willfulness" for purposes of the attorneys' fee provision, stating: "'If a municipality denies access to records by invoking a legal position that is not supported by existing law or by a good faith argument for the modification of existing law, the circumstances of the case will likely warrant a finding of willfulness.'" *Id.* at *6 (quoting *Clarke v. City of Memphis*, 473 S.W.3d 285, 290 (Tenn. Ct. App. 2015)). The *Taylor* court explained that a records custodian's reliance on legal advice to justify the refusal to produce records will not alter a finding of willfulness if the governing law is clear. *Id.* at *8. The court wrote:

- 12 -

[I]t matters not that a records custodian sought out legal advice if the legal position adopted by the records custodian is without any basis in the law or a good faith argument for a modification of the law. After all, governmental entities are themselves charged with fostering access to public records under the TPRA. When a governmental entity is confronted with a public records request, it assumes ultimate responsibility for a faithful and legal administration of the TPRA. Indeed, a governmental entity "cannot remain unknowledgeable of the [TPRA] and authority interpreting it and thereby immunize itself from liability for attorneys fees. A request for access to a public record imposes a duty on the entity to inform itself of its legal obligations." Although deference to counsel may certainly be advisable, we are of the opinion that such deference does not countenance against a finding of willfulness in situations where there is no good faith legal argument for the denial of access.

*Id.* (quoting *The Tennessean v. City of Lebanon*, No. M2002-02078-COA-R3-CV, 2004 WL 290705, at *9 n.8 (Tenn. Ct. App. Feb. 13, 2004)). Concluding that the town had acted willfully in denying two of Mr. Taylor's requests for documents, the Court of Appeals awarded Mr. Taylor the costs and fees he incurred on appeal and remanded the case to the trial court with instructions to reconsider its decision not to award him the fees and costs he had incurred at trial. *Id.* at *8-9. "[A] heightened showing of 'ill will' or 'dishonest purpose' is not necessary in order to establish willfulness under [Tenn. Code Ann. § 10-7-505(g)]." *Friedmann v. Marshall Cnty., Tenn.*, 471 S.W.3d 427, 437 (Tenn. Ct. App. 2015); *see also Taylor*, 2017 WL 2984194, at *5-6.

In *Schneider v. City of Jackson*, the City refused to produce two different categories of records on the basis that one set of documents was protected by the law enforcement privilege and the other set constituted confidential property. *Schneider*, 226 S.W.3d at 336-38. The trial court rejected the City's argument and ordered the City (1) to produce both categories of the requested documents and (2) to pay the petitioners' attorneys' fees pursuant to Tenn. Code Ann. § 10-7-505(g). *Id.* at 338. The City appealed, arguing that the law enforcement privilege exempted some of the records from the Act and that it should not be required to pay the petitioners' attorneys' fees. *Id.* at 338-39. The Court of Appeals agreed with the City and reversed the trial court's judgment as to both issues appealed. *Id.* at 339. The petitioners sought review by the Supreme Court, and the Supreme Court reinstated the trial court's ruling in full. *Id.* at 344, 348. The Court concluded the City acted willfully in refusing the petitioners' requests, in part, because the City relied on a common law privilege that had not been adopted in Tennessee. *Id.* at 347. The Court was not sympathetic to the City's argument that it had a good faith belief that the documents the petitioners were seeking were protected by the law enforcement privilege based upon cases in other jurisdictions. *Id.*

In this case, Metro focuses on the reasonableness of its policy in producing copies within seven days and its reliance on advice from the Municipal Technical Advisory Service.[3] Metro contends that its accident-report policies were always carried out in good faith and resulted from Metro's attempt "to balance the need to promptly serve both the general public (for example, individuals who may need a report for insurance purposes) and large volume, commercial requestors (such as Plaintiff)." As shown above, however, Metro cannot insulate itself from a finding of willfulness by adopting policies or relying on advice that is inconsistent with the requirements of the Act.

Metro points out that its Form 720, which the trial court found violated the TPRA's promptness requirement, was used only for requests for copies, not requests for inspections. Relying on Tenn. Code Ann. § 10-7-506(a), Metro argues that its custodian of records has the right to adopt reasonable rules regarding copies. That section provides:

> In all cases where any person has the right to inspect any such public records, such person shall have the right to take extracts or make copies thereof, and to make photographs or photostats of the same while such records are in the possession, custody and control of the lawful custodian thereof or such custodian's authorized deputy; provided, that the lawful custodian of such records shall have the right to adopt and enforce reasonable rules governing the making of such extracts, copies, photographs or photostats.

Tenn. Code Ann. § 10-7-506(a).

This statute permits a records custodian to adopt reasonable rules, but any such rules must fall within the confines of the TPRA. In *The Tennessean v. Electric Power Board of Nashville*, 979 S.W.2d 297 (Tenn. 1998), for example, the Supreme Court ruled that the TPRA permitted the defendant to charge the petitioner for the costs of providing the records requested, but the statute did not authorize the defendant to charge the petitioner for the costs it incurred in notifying its customers that information regarding the customers had been requested. *The Tennessean*, 979 S.W.2d at 304-05. The Court explained:

> We think the language and meaning of Tenn. Code Ann. § 10-7-506(a) is plain: that an agency may enforce reasonable rules "governing the making of such extracts, copies, photographs or photostats." Those actual costs incurred by NES for disclosing the material requested by *The Tennessean* are recoverable under this statute. In contrast, there is no authority under the Act allowing an agency to establish rules that would substantially

---

[3]Metro does not attempt to explain its delay in producing the accident reports for inspection or argue that the trial court erred in finding it failed to produce the accident reports for inspection promptly.

inhibit disclosure of records. Moreover, limiting an agency to rules that govern only the actual "making" of the extracts, copies, photographs or photostats is consistent with the legislative policy in favor of the fullest possible public access.

*Id.* at 305. The Court of Appeals has ruled that custodians are not permitted to adopt rules that impose more conditions on a citizen's right to access public records than is permitted by the TPRA. For example, a custodian may not deny a citizen's access to records if the request is not made in person. *Waller v. Bryan*, 16 S.W.3d 770, 773-74 (Tenn. Ct. App. 1999). In *Hickman v. Tennessee Board of Probation and Parole*, No. M2001-02346-COA-R3-CV, 2003 WL 724474, at *11 (Tenn. Ct. App. Mar. 4, 2003), the Court of Appeals held that a custodian's rule requiring a requestor to pay for the cost to copy and ship the documents was reasonable under the Act.

Metro's Form 720 stated that Metro had seven business days to provide copies of public records, and if Metro could not fulfill the request within seven business days, it would let the requestor know when the copies would be available. Metro cited Tenn. Code Ann. § 10-7-503(a)(2)(B) on the form as authority for the seven-day period. However, the statute gives a custodian up to seven business days to make a record available for inspection only "[i]n the event it is not practicable for the record to be promptly available for inspection." Tenn. Code Ann. § 10-7-503(a)(2)(B). Although Metro followed a practice of promptly providing three or fewer copies of records when a request was made, it systematically refused to satisfy any request for more than three copies while the requestor waited, even if providing more than three copies was practicable at that time. By systematically denying any request for more than three copies of public records at a time, Metro was not complying with the Act's mandate that records be made available promptly. Only if it is not practicable for a custodian to satisfy a request promptly is the custodian permitted to delay production of the document as set forth in Tenn. Code Ann. § 10-7-503(a)(2)(B)(i)-(iii). Metro is permitted to adopt reasonable rules governing the making of such copies by, for example, charging for the cost of copying and the shipping fee, if applicable, but its rules must not conflict with other aspects of the Act.

Metro contends that the Act's requirement that documents be provided "promptly" only refers to the inspection of documents, not to copies. We disagree. Tennessee Code Annotated section 10-7-506(a) provides:

In all cases where any person has the right to inspect any such public records, *such person shall have the right to take extracts or make copies thereof*, and to make photographs or photostats of the same *while such records are in the possession, custody and control of the lawful custodian thereof* or such custodian's authorized deputy; provided, that the lawful custodian of such records shall have the right to adopt and enforce

- 15 -

> reasonable rules governing the making of such extracts, copies, photographs or photostats.

(Emphasis added.) Subsection 503(a)(2)(B) requires public records to be made available for inspection promptly, and subsection 506(a) gives the person inspecting the records the right to make copies while they are in the possession, custody, and control of the custodian. When interpreting a statute, "[i]t is a . . . well-settled rule of construction that 'statutes "in pari materia"—those relating to the same subject or having a common purpose—are to be construed together, and the construction of one such statute, if doubtful, may be aided by considering the words and legislative intent indicated by the language of another statute.'" *Graham v. Caples*, 325 S.W.3d 578, 582 (Tenn. 2010) (quoting *Wilson v. Johnson Cnty.*, 879 S.W.2d 807, 809 (Tenn.1994)). '"The text of the statute is of primary importance, and the words must be given their natural and ordinary meaning in the context in which they appear and in light of the statute's general purpose."' *Friedmann*, 471 S.W.3d at 433 (quoting *Mills v. Fulmarque, Inc.* 360 S.W.3d 362, 368 (Tenn. 2012)). Because words used in a statute "are known by the company they keep, courts must also construe these words in the context in which they appear in the statute and in light of the statute's general purpose." *Lee Med., Inc. v. Beecher*, 312 S.W.3d 515, 526 (Tenn. 2010) (citing *State v. Flemming*, 19 S.W.3d 195, 197 (Tenn. 2000); *State ex rel. Comm'r of Transp. v. Med. Bird Black Bear White Eagle*, 63 S.W.3d 734, 754-55 (Tenn. Ct. App. 2001); *N.C. & St. L. Ry. v. Carroll Cnty.*, 12 Tenn. App. 380, 387 (1930)). Courts are directed to harmonize any conflicting provisions and to "constru[e] each provision consistently and reasonably." *Id.* (citing *Hill v. City of Germantown*, 31 S.W.3d 234, 238 (Tenn. 2000), and *Sallee v. Barrett*, 171 S.W.3d 822, 828 (Tenn. 2005)). "The courts' goal is to construe a statute in a way that avoids conflict and facilitates the harmonious operation of the law." *Id.* (citing *Frazier v. E. Tenn. Baptist Hosp., Inc.*, 55 S.W.3d 925, 928 (Tenn. 2001), and *In re Audrey S.*, 182 S.W.3d 838, 869 (Tenn. Ct. App. 2005)).

If a requestor is entitled to inspect public records promptly, and if the requestor is entitled to make copies of the records inspected while they are in the possession, custody, and control of the record custodian, it naturally follows that the requestor is entitled to obtain copies of the records promptly. Section 503(a) of the Act, which is where the "promptly" language is found, addresses the public's right to copies in addition to inspections; the public's right to obtain copies of records is not addressed exclusively in section 506(a), as Metro implies. *See* Tenn. Code Ann. § 10-7-503(a)(7)(C) (records custodians may charge a reasonable fee for producing copies of the records). Moreover, the fact that Metro cited Tenn. Code Ann. § 10-7-503(a)(2)(B) on Form 720 as authority for its assertion that it had seven business days to process requests for copies shows that Metro assumed the promptness requirement also applied to copies when it created Form 720.[4] We believe this construction of the Act complies with its overall purpose of

_____

[4]We acknowledge Metro's reliance on the case *Lance v. York*, 359 S.W.3d 197 (Tenn. Ct. App. 2011),

- 16 -

"'promot[ing] public oversight of governmental activities.'" *Friedmann*, 471 S.W.3d at 433 (quoting *Gautreaux v. Internal Med. Educ. Found., Inc.*, 336 S.W.3d 526, 529 (Tenn. 2011) (citation omitted)). Our interpretation also carries out the Act's directive that it "be broadly construed so as to give the fullest possible public access to public records." Tenn. Code Ann. § 10-7-505(d).

We find the trial court's findings of fact are supported by the evidence that was before it and that the evidence supports the trial court's conclusion that Metro willfully failed to provide Mr. Jetmore promptly with the traffic accident reports he requested for inspection. The evidence further supports the trial court's conclusion that Metro willfully failed to provide Mr. Jetmore promptly with copies of accident reports that he requested, as required by Tenn. Code Ann. § 10-7-503(a)(2)(B). Because Metro acted willfully in denying Mr. Jetmore the accident reports in the way the statute required, we affirm the trial court's award to Mr. Jetmore of his attorneys' fees.

### C. Mootness

Metro's final argument is that this case should be dismissed as moot because when the trial court held the hearing on Mr. Jetmore's request for attorneys' fees on September 16, 2016, Mr. Jetmore's attorney informed the trial court that Metro had begun to provide Mr. Jetmore with records "on a timely basis." The Supreme Court has explained that "[a]n issue becomes moot if an event occurring after the commencement of the case extinguishes the legal controversy attached to the issue, or otherwise prevents the prevailing party from receiving meaningful relief in the event of a favorable judgment." *City of Memphis v. Hargett*, 414 S.W.3d 88, 96 (Tenn. 2013) (citing *Lufkin v. Bd. of Prof'l Responsibility*, 336 S.W.3d 223, 226 (Tenn. 2011)).

Metro has failed to show that an event occurred after Mr. Jetmore filed his petition that either extinguished the legal controversy involved in the case or otherwise prevented Mr. Jetmore from receiving meaningful relief. The trial court filed its initial Memorandum and Order providing Mr. Jetmore with injunctive relief on August 22, 2016. Counsel for Mr. Jetmore stated at the hearing on his motion for attorneys' fees the following month, on September 16, that Mr. Jetmore had filed his petition "so that [he] could get what [he's] now [sic] getting now, which is the records back on a timely basis." Metro has not demonstrated that it was providing either prompt inspection or prompt copies of the reports before the trial court issued its order in August 2016. In fact, Metro filed a post-trial motion seeking a stay pending appeal that undercuts its argument that this case is moot. In its motion, Metro argued that it is not always able to comply with the trial court's 72-hour rule for various reasons. It thus appears that the reason Metro

---

which reaches a different conclusion than we do here. We disagree with the outcome in that case to the extent it finds that copies of public records are not subject to the promptness standard set forth in Tenn. Code Ann. § 10-7-503(a)(2)(B).

has begun to provide prompt inspection and copies, to the extent that it has, is because the trial court ordered it to do so. Metro's argument that this case is moot is not well-taken.

D. Modification of Injunctive Relief

Metro makes the argument that its accident reports are not final until the supervising officer submits them into TITAN, which does not always occur during the same shift, or even on the same day, that the investigating officer submits his or her report into the system. Mr. Jetmore agrees that an accident report does not become an official report of the MNPD until a supervisor reviews the investigating officer's report and submits it into TITAN. At oral argument, counsel for Mr. Jetmore confirmed that his client was interested in final reports, not draft reports. Thus, we believe that the injunctive relief the trial court awarded by Order filed on November 2, 2016, should be modified so that the 72-hour period begins to run from the date the supervising officer, not the investigating officer, completes and submits the accident report to TITAN. The enforcement part of the trial court's Order should be modified as follows:

1. In the event a request for an accident report is made, Metropolitan Government of Nashville and Davidson County shall provide for the inspection of such traffic accident reports that it creates and maintains, within seventy-two hours from the time the supervising officer completes and submits the report to TITAN.

2. In the event a request for an accident report is made, Metropolitan Government of Nashville and Davidson County shall produce copies of such traffic accident reports that it creates and maintains, within seventy-two hours from the time the supervising officer completes and submits the report to TITAN.

3. All such requests for inspection or copies shall be furnished to the requestor during regular business hours.

4. Metropolitan Government of Nashville and Davidson County shall amend its MNPD Form 720 to make it consistent with the language set forth in T.C.A. § 10-7-503(a)(2)(B).

5. In the event Metropolitan Government of Nashville and Davidson County is unable to promptly produce requested accident reports, then pursuant to T.C.A. § 10-7-503(a)(2)(B), it shall send within seven business days a written notification advising the requestor of the approximate date when said reports will be available.

- 18 -

This case is remanded to the trial court with directions that the trial court modify its Order filed on November 2, 2016, as set forth above.

## IV. CONCLUSION

The judgment of the trial court is affirmed, as modified herein, and this matter is remanded with directions to the trial court to modify its Order filed on November 2, 2016, as set forth above. Costs of this appeal shall be taxed against the appellant, the Metropolitan Government of Nashville and Davidson County.

_____
ANDY D. BENNETT, JUDGE